UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD PORTER,

     Petitioner,

v.

SHANE JACKSON,

     Respondent.

Case No. 14-12998
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL, AND AMENDING CASE CAPTION**

---

This is a *pro se* habeas case under 28 U.S.C. § 2254. After the shooting death of his girlfriend Lauri Pilot, at their home in Henderson, Michigan on December 15, 2010, a Shiawassee County jury convicted Donald Porter of first-degree murder in violation of Michigan Compiled Laws § 750.316(1)(a) and possession of a firearm during the commission of a felony in violation of § 750.227b. Porter was sentenced to life in prison without parole for the murder conviction and a consecutive two-year term of imprisonment for the firearm conviction. His habeas claims lack merit, so the Court will deny his petition.

## I.

By way of background, the Michigan Court of Appeals described some of the relevant facts as follows:

> Defendant's convictions arise from the December 15, 2010 shooting death of his live-in girlfriend, Lauri Pilot, in their house in Henderson, Michigan. Evidence indicated that defendant and Pilot had a tumultuous relationship. The prosecution's theory was that, on the night of Pilot's death, defendant and Pilot argued before defendant placed a 20–gauge shotgun directly on Pilot's chest and pulled the trigger. Pilot died instantly. When the police arrived, Pilot was lying on

her bed with a shotgun parallel to her body. Defendant initially told the police that Pilot committed suicide, but later stated that the shotgun accidentally discharged during a mutual struggle over the gun. At trial, the prosecution presented evidence through expert witnesses and law enforcement personnel that Pilot's death was a homicide, that she suffered a tight contact wound, that the scene was altered, and that it was unlikely that Pilot died from a self-inflicted wound or an accidental shooting. The defense maintained that defendant did not shoot Pilot, and defendant testified that Pilot committed suicide.

The prosecution presented the testimony of a jailhouse informant, Richard Turner, who testified that defendant made several comments about his case, including that he had been fighting with Pilot over a "legal issue" concerning the title to the house, and that defendant had another girlfriend who came to visit him in jail. Turner was cross-examined regarding his pending charge of manufacturing more than 200 marijuana plants, and denied being promised anything in return for his testimony.

*People v. Porter*, No. 308094, 2014 WL 575760, *1–2 (Mich. Ct. App. Feb. 11, 2014) (per curiam) (footnoted citation omitted). The Court will discuss other relevant facts throughout its analysis.

Following his convictions and sentencing, Porter filed an appeal of right with the Michigan Court of Appeals, raising six claims: (1) the evidence was insufficient to sustain the first-degree murder conviction; (2) the trial court erred by allowing witness testimony about statements the victim had made before her death about Porter's threat to kill her; (3) the trial court erroneously refused to suppress Porter's inconsistent statements to the police; (4) the trial court erred in refusing to give a jury instruction on involuntary manslaughter; (5) the trial court improperly restricted Porter's cross-examination of a jailhouse informant; and (6) the trial court erred in allowing the late endorsement of the jailhouse informant as a witness. In an explained decision, the appellate court denied relief on those claims and affirmed Porter's convictions. *Id.* at *2–10. Porter then filed an application for leave to appeal with the Michigan Supreme Court raising the same claims. The court denied leave to appeal because it was "not persuaded that the questions presented should be reviewed." *People v. Porter*, 847 N.W.2d 506 (Mich. Jun. 24,

2014). Porter's habeas petition raises the same six claims as his direct appeal. (R. 1.) He has not petitioned the United States Supreme Court for *certiorari* nor sought post-conviction relief in state court.

## II.

The standard of review this Court applies to each of Porter's claims depends on whether the claim was "adjudicated on the merits in State court[.]" 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289 (2013). If the Michigan Court of Appeals decided a claim "on the merits," the Antiterrorism and Effective Death Penalty Act of 1996 prohibits this Court from granting habeas corpus relief  unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d). But "[w]hen a state court does not address a claim on the merits, . . . 'AEDPA deference' does not apply and [this Court] will review the claim *de novo*." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

## III.

### A.

Porter first asserts that he is entitled to habeas relief because the prosecution failed to present sufficient evidence to support his first-degree murder conviction, particularly on whether he acted with premeditation and deliberation.

To assess a sufficiency of evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Davis v.*

3

*Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The *Jackson v. Virginia* standard 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). The standard "is so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)). "Adding to this extremely high bar are the stringent and limiting standards of AEDPA," which allows a federal habeas court to disrupt "a state court's decision that correctly identified and applied the controlling Supreme Court precedent only if the application of that precedent was objectively unreasonable, meaning more than incorrect or erroneous." *Id.* (internal quotation marks and citations omitted). The *Jackson* standard "is applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law,'" so the Court will look to Michigan law. *Id.* at 531 (quoting *Jackson*, 443 U.S. at 324 n.16).

Under Michigan law, first-degree murder includes "[m]urder perpetrated by means of . . . any . . . willful, deliberate, and premeditated killing." Mich. Comp. Laws § 750.316(1)(a). Relevant factors for establishing premeditation and deliberation include "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *See*, *e.g.*, *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992) (citations omitted). In other words, "[t]he elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing." *Id.* (citation omitted).

The Michigan Court of Appeals rejected Porter's claim "on the merits" as follows:

[T]he prosecution presented evidence that defendant and Pilot had a tumultuous relationship, fueled by heavy alcohol consumption. Defendant's nephew and brother observed Pilot slap defendant on occasion. Pilot's father observed Pilot with black eyes a few times. Pilot's father also received several calls from Pilot over the course of the parties' relationship because she and defendant were arguing. After one such call, Pilot's father went to the house, calmed down defendant and Pilot, and, on noticing a shotgun in the garage, took it home out of concern. He returned the gun about a month before Pilot's death. Two days before her death, Pilot told a coworker that defendant had threatened to kill her. On the day of Pilot's death, as defendant acknowledged, defendant and Pilot were involved in an argument, which led to Pilot throwing a plate of food at defendant and going into the bedroom. Subsequently, Pilot was found dead on her bed with the shotgun aligned next to her body.

Medical evidence indicated that the 20–gauge shotgun was placed "right up against" the center of Pilot's chest when the trigger was pulled, leaving a "relatively large wound." Afterward, the spent shell casing was manually ejected from the chamber of the shotgun; it was not an automatic weapon that would eject the shell as part of the firing process. Defendant's DNA was found on the trigger of the shotgun. Expert medical testimony indicated that because of the explosive and extensive injuries from the "tight contact gunshot," Pilot immediately collapsed and died; therefore, it was extremely improbable that she could have ejected the shell after firing, supporting the inference that someone else ejected it. Defendant and Pilot were the only two people in the house. A jury could reasonable infer from this evidence that defendant placed the 20–gauge shotgun directly on Pilot's chest, pulled the trigger, ejected the spent shell casing, and placed the gun next to her body.

Further, the evidence showed that defendant did not use the working cellular telephone in the house to call 911, but instead went to his nephew's residence and announced that Pilot had committed suicide. The officers who arrived at the scene, many with several years of experience in investigating suicide deaths involving a long gun, immediately observed that the scene was inconsistent with a suicide and appeared to have been altered. Both a medical expert and a firearms expert also agreed that the scene had been altered and there was a "cover-up." Testimony from both the responding paramedic and a law enforcement officer also indicated that Pilot had not died as recently as defendant reported. From this testimony, a jury could reasonably infer that after shooting Pilot at close range with a 20–gauge shotgun, defendant took the time to adjust the scene to stage a suicide before reporting her death. In addition, defendant gave the police three different versions of what occurred, first stating that Pilot shot herself, and ultimately stating that the gun accidentally discharged as he and Pilot struggled over it. But there was no sign of a struggle around the body or in the bedroom. At trial, defendant reverted to the assertion that Pilot committed suicide.

> The reasonable inferences arising from this evidence, considered together, were sufficient to support a finding of premeditation and deliberation for first-degree murder beyond a reasonable doubt. Although defendant argues that different inferences should be drawn from the evidence, those challenges are related to the weight of the evidence rather than its sufficiency. . . . The same challenges asserted on appeal were presented to the jury during trial. This Court will not interfere with the jury's role of determining issues of weight and credibility. . . . Rather, this Court must draw all reasonable inferences and make credibility choices in support of the jury's verdict, and that deferential standard of review "is the same whether the evidence is direct or circumstantial." . . . Viewed in a light most favorable to the prosecution, the evidence was sufficient to sustain defendant's conviction of first-degree premeditated murder.

*Porter*, 2014 WL 575760 at *2-3 (internal citations omitted).

There is nothing unreasonable about this decision and it is fully supported by the record.

For one, Porter and Pilot had a tumultuous relationship. (*See*, *e.g.*, 8-16, PID 1170.) At times, their often alcohol-fueled disagreements became physical. (*See*, *e.g.*, 8-16, PID 1190, 1208.) And according to Pilot's co-worker, Ashley Rolfe, Pilot said days before the shooting that Porter had even threatened to kill her. (R. 8-6, PID 1304.) (As the Court will discuss later, it was not unreasonable for the Michigan Court of Appeals to conclude that this testimony was admissible.) They argued again on the day of the shooting.

A reasonable jury could have inferred that the ensuing shotgun wound to Pilot's chest was inconsistent with suicide, for several reasons. The gun was found in an unnatural position next to her body. (R. 8-18, PID 1893.) The wound was consistent with Pilot laying still at the time of the shooting, meaning Porter would have had time to contemplate his actions while approaching her with the gun. (*See* R. 8-18, PID 1843.) Absent was the type of blood splatter expected from a self-inflicted wound. (R. 8-17, PID 1356, 1530.) Moreover, a spent shell casing was found on the floor, one that in all likelihood had to have been manually removed from the weapon by someone other than the victim. (R. 8-17, PID 1564, 1571.) And Porter's own DNA matched a sample taken from the trigger. (R. 8-19, PID 2182–83.)

6

After the shooting, instead of calling 911, Porter left the scene and told family members that Pilot had committed suicide. (R. 8-16, PID 1282.) But he left only after apparently altering the crime scene, leaving the gun placed "neatly" next to her. (R. 8-17, PID 1530.) He subsequently gave inconsistent accounts to the police, one including a claim the gun went off during a struggle between the two of them. (R. 8-19, PID 2024.) The Court of Appeals reasonably found that this overwhelming evidence was sufficient to sustain the jury's first degree murder conviction.

Porter's arguments to the contrary are meritless. First, he attacks the credibility of Dr. Brian Hunter, a forensic pathologist who opined that Pilot's death was not a suicide, in part because another forensic pathologist, Dr. Joyce DeJong (the medical examiner in the case), classified the cause of death as "indeterminate." (R. 11, PID 3135; R. 8-18, PID 1895; R. 8-18, PID 1857.) But "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). Second, Porter criticizes the Michigan Court of Appeals for failing to emphasize that he was drunk at the time of his questioning by police. (R. 11, PID 3136.) But that too has little relevance to the sufficiency of the evidence, and even he acknowledges that intoxication is no defense to a crime under Michigan Compiled Laws § 768.37(1). (R. 11, PID 3138.)

Thus, habeas relief is not warranted for Porter's first claim.

### B.

Porter's next claim for habeas relief is that the trial court erred in admitting certain testimony from Ashley Rolfe, Pilot's co-worker at a bar at the time of the homicide. (R. 8-16, PID 1298.) According to Rolfe, Pilot summoned her to pick her up at her house just days before

the homicide, and when Pilot got in the car, she said, "I had to get the hell out of here, he

threatened to kill [me]." (R. 8-16, PID 1304.)

In his direct appeal, Porter argued that trial court erred by admitting this testimony under

Michigan Rule of Evidence 804(b)(7), Michigan's "catch all" exception to the hearsay rule when

the declarant is unavailable. (R. 1, PID 34.) The Michigan Court of Appeals rejected the claim as

follows:

> We agree with the trial court that Pilot's statement to Rolfe had sufficient
> guarantees of trustworthiness to be admissible at trial. The record establishes that
> Pilot's statement was made spontaneously. Pilot called the bar where she worked
> part time to ask Dick Dedic, her boss, if he could pick her up and bring her to the
> bar; she was not scheduled to work. Rolfe, a bartender and server, was told to
> make the five-minute drive to pick up Pilot. As soon as Rolfe pulled in the
> driveway of Pilot's residence, Pilot entered the vehicle and, without any
> prompting, immediately stated, "I had to get the hell out of there. He threatened to
> kill me." Rolfe did not ask Pilot any questions before Pilot made this statement
> and there is no indication that the statement was made in response to anything
> Rolfe said, or under any circumstances of undue influence. Although there was
> some indication that Pilot had been drinking, Rolfe and Dedic both testified that
> Pilot was not intoxicated. Pilot appeared visibly upset and concerned. She did not
> seem normal. Pilot made the statement to Rolfe even though Rolfe and Pilot were
> not friends "of any kind." It was unusual for Pilot to share something of this
> nature with Rolfe, and Rolfe was not a person in whom Pilot would normally
> confide. These facts support the admissibility of Pilot's statement. After Pilot's
> unprompted statement, Rolfe asked, "What?" and, instead of providing any other
> statements that altered her prior statement, Pilot simply repeated her prior
> statement that "he threatened to kill me." Thus, Pilot's statements were consistent.
> Further, there was no indication that Pilot or Rolfe had any bias or motive to
> fabricate, or that Pilot had anything to gain by falsely making this statement to
> Rolfe, thereby enhancing the statement's reliability and trustworthiness.
> Considering the totality of the circumstances, the trial court did not err in finding
> that the statement had sufficient indicia of reliability.
>
> We also agree with the trial court that the statement was evidence of a material
> fact because it was probative of defendant's premeditation, inasmuch as it showed
> that defendant had threatened to kill Pilot within 48 hours of her death. "A
> material fact is '[a] fact that is significant or essential to the issue or matter at
> hand.'" . . . As the court observed, the statement was particularly relevant to
> defendant's intent, given his defense that Pilot's death was the result of a self-
> inflicted wound or the accidental discharge of the shotgun. The statement was
> also more probative of defendant's intent than any other evidence that the

prosecution could procure through reasonable efforts. This requirement "essentially creates a 'best evidence' requirement." . . . The prosecution advised the court that no other evidence of this fact was available, and we discern no indication from the record that there was any other evidence to show that defendant had contemplated to kill Pilot within close proximity to the time of her death. Therefore, admission of the statement "serves the interest of justice." . . . Finally, there is no dispute that defendant had sufficient notice of the prosecutor's intent to offer Pilot's statement. Consequently, the trial court's decision to allow the evidence under MRE 804(b)(7) did not fall outside the range of reasonable and principled outcomes.

*Porter*, 2014 WL 575760 at *3–5. (internal citations omitted).

As an initial matter, to the extent that Porter asks this Court to grant relief on the grounds that the state courts erred in their application of Michigan Rule of Evidence 804(b)(7) that is not a valid ground for federal habeas relief. A federal habeas corpus court "cannot grant the writ based on [its] disagreement with state-court determinations on state-law questions." *Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (internal quotation marks and citations omitted). But a federal habeas court can grant relief if "the state-court determination is so fundamentally unfair that it deprives a defendant of [the] due process" guaranteed by the Due Process Clause. *Id.* In his direct appeal brief, Porter urged in passing that Due Process under the Fourteenth Amendment "prevent[s] fundamental unfairness in the use of evidence," but he offered no legal analysis on the supposed constitutional dimensions of his claim. (R. 1, PID 34.) So it comes as no surprise that the Michigan Court of Appeals did not expressly address the Due Process implications of Rolfe's testimony. But it is unlikely the Michigan Court of Appeals would have agreed with the trial court that Pilot's out-of-court statements were sufficiently trustworthy had the court thought admission of the statements fundamentally deprived Porter of a fair trial. So this Court will presume that Rolfe's Due Process claim was decided "on the merits" and thus apply AEDPA deference. *See Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must

presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.").

The Michigan Court of Appeals reasonably concluded that Pilot's out-of-court statement to Rolfe had sufficient guarantees of trustworthiness: Pilot requested a ride to work at a time she was not scheduled to be at work, she spontaneously made the statement to a co-worker, the two were not particularly close, neither had a motive to lie, and Pilot was not intoxicated when she made the statement. Porter's threat to kill Pilot just two days before she was shot was also highly relevant to show his intent and premeditation, undermining his inconsistent claims that the shotgun either discharged accidentally during a struggle or that Pilot committed suicide. Porter points to no clearly established law suggesting that Rolfe's testimony deprived him of a fair trial.

Instead, in his reply brief, Porter points to *Crawford v. Washington*, 541 U.S. 36 (2004), and urges that Rolfe's testimony was a "cheap shot" at violating his rights under the Confrontation Clause. (R. 11, PID 3140.) But Porter never exhausted a Confrontation Clause claim. He did not raise it on direct appeal in his claim addressing Rolfe's testimony. And while he did so in his application for leave to appeal to the Michigan Supreme Court (*see* R. 1, PID 51), "the submission of new claims to a state's highest court on discretionary review does not constitute fair presentation of the claims to the state courts," a requirement for exhaustion, *Skinner v. McLemore*, 425 F. App'x 491, 494 (6th Cir. 2011) (citing *Castille v. Peoples*, 489 U.S. 346, 349 (1989)). Still, in some circumstances, a habeas court can deny the writ [petition?] for an unexhausted claim. *See* 28 U.S.C. § 2254(b)(2); *see also Hickey v. Hoffner*, No. 16-1186, 2017 WL 2829523, at *4 (6th Cir. June 30, 2017) (construing § 2254(b)(2) to authorize district courts to reject only "plainly meritless" unexhausted claims). Here, to the extent Porter is

10

attempting to raise a Confrontation Clause claim for the first time, this unexhausted claim is plainly meritless.

As the Supreme Court held in *Crawford*, the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54. Testimonial statements include "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, . . . extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, . . . statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, [and] . . . [s]tatements taken by police officers in the course of interrogations." *Id.* at 51–52. Petitioner has cited no authority holding that an unsolicited statement made to an acquaintance in an attempt to escape potential violence constitutes a "testimonial" statement. *See, e.g., Ohio v. Clark*, 135 S. Ct. 2173, 2182, 192 L. Ed. 2d 306 (2015) ("Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers."); *cf. Davis v. Washington*, 547 U.S. 813, 822 (2006) (holding even that statements "made in the course of police interrogation" are non-testimonial when the "circumstances objectively indicat[e] that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency").

Accordingly, habeas relief is not warranted for Porter's second claim, whether his theory is a hearsay violation, a Due Process violation, or a Confrontation Clause violation.

### C.

Porter next asserts that he is entitled to habeas relief because the trial court erred by denying his motion to suppress certain inculpatory statements he made to the police before he was *Mirandized*.

At a pretrial suppression hearing, Shiawassee County Detective Sergeant Scott Shenk testified that during questioning at the sheriff's department on the morning following Pilot's death, Porter offered multiple conflicting accounts. (R. 8-8, PID 462, 504, 506.)  The trial court suppressed part of Porter's statements, finding that at a certain point the interview shifted into a custodial interrogation. (R. 8-8, PID 546.)

But that decision still allowed some of Porter's statements in at trial. There, Detective Shenk testified that he questioned Porter from 5:15 a.m. until 7:23 a.m. (R. 8-21, PID 2343.) Shenk said that Porter first maintained that when he found that Pilot had shot herself, he gave her a hug, moved the gun slightly and then put it back where it was. (R. 8-21, PID 2351.) In that version, Porter claimed he did not hear a gunshot. (*Id.*) Next, Porter offered that if he had shot Pilot, he must have blacked out. (R. 8-21, PID 2352.) Then Porter offered a third version: that he remembered that he had shot and killed her. (R. 8-21, PID 2353.) But then he said that he had seen her with the gun up against her chest, and when he reached for it, either he or she pulled the trigger, but he did not know who. (R. 8-21, PID 2355.)

In his direct appeal, Porter argued that his statements arose from a custodial interrogation because he had been properly *Mirandized*. The Michigan Court of Appeals rejected that claim on the merits as follows:

> At an evidentiary hearing, defendant did not testify, but the court heard testimony from the interviewing detective. According to the detective, after defendant's house was designated a crime scene, defendant was placed in a patrol car in the driveway of the residence to stay warm. Although the rear doors had no handles,

defendant could exit the car because a deputy was always in the car. In fact, defendant left the car to urinate on occasion. For the most part, defendant slept while in the rear of the patrol car. Ultimately, the interviewing detective opened the car door, told defendant that he was not under arrest, and asked defendant if he would voluntarily accompany him to the sheriff's department to give a statement. The detective advised defendant that he wanted to talk to him about what he and Pilot had done that day. Defendant did not have a working vehicle that he could drive to the sheriff's department, so he rode with the detective. The detective's car was a "regular automobile," not a patrol car, so it had operable backdoor handles and was not equipped with a cage or other restrictive equipment. In addition to verbally being told that he was not under arrest, defendant was not restrained in any manner at the scene or during the ride. Upon arrival at the department, defendant accepted the offer of a cup of coffee and asked for a cigarette. Defendant was provided with two cigarettes, shown where he could smoke outside, and told to knock on the door when he wanted to come back inside. The outside area was not fenced in, and defendant could have simply walked away. Although defendant notes that his home was several miles away, as the trial court noted, defendant could have walked to the payphone at the gas station across the street if he wanted to call someone for a ride. The interviewing detective also testified that defendant "absolutely" would have been driven back home if he had asked. The interview lasted approximately two hours. During that period, however, defendant took at least five breaks, from five to 15 minutes each, where he freely went outside and smoked one or two cigarettes. Defendant was never handcuffed or restrained in any way during the interview.

Considering the totality of the objective circumstances in this case, the trial court did not err in concluding that defendant was not "in custody" such that *Miranda* warnings would have been required. Defendant's argument is based primarily on his trial testimony that he did not subjectively feel free to leave. However, the pertinent inquiry is objective, not subjective. . . . Moreover, as the trial court noted, during defendant's recorded custodial statement, which was not admitted at trial, defendant acknowledged that he was free to leave before being given his *Miranda* rights. Consequently, because defendant was not in custody prior to that time, *Miranda* warnings were not necessary, and the trial court did not err by partially denying his motion to suppress his statements.

*Porter*, 2014 WL 575760 at *5–6 (internal citation omitted).

This decision was not contrary to nor an unreasonable application of clearly established federal law. In *Miranda v. Arizona*, 384 U.S. 436, 458, 532 (1966), the Supreme Court held that certain pre-interrogation warnings are required during "custodial interrogations" because of the "compulsion inherent in custodial surroundings." The Supreme Court defined "custodial

interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Subsequently, "the Supreme Court framed the proper inquiry as involving two essential questions: '[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *Coomer v. Yukins*, 533 F.3d 477, 485 (6th Cir. 2008) (quoting *Thompson v Keohane*, 516 U.S. 99, 112 (1995)). "The Court directed that '[o]nce the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* at 485–86 (quoting *Keohane*, 516 U.S. at 112).

The record supports the Michigan Court of Appeals' determination that Porter was not in custody when he spoke with detectives at the sheriff's department before being arrested. First, Porter voluntarily agreed to accompany the detective to the sheriff's department, was advised that he was not under arrest, and was driven to the sheriff's department in a regular car without being handcuffed or otherwise restrained. Second, while the interview was conducted at the sheriff's department, Porter was not restrained and was able to go outside alone in an unfenced area for several smoking breaks. Third, the interview, including the breaks, lasted only a little over two hours, and nothing suggests that the questioning was hostile or coercive. Fourth, Porter was free to leave at any time before he was arrested. Given such circumstances, it was not unreasonable for the state court to conclude that Porter failed to establish a violation of his *Miranda* rights.

It is true, as Porter points out in his reply brief, that the Michigan Court of Appeals did not expressly consider his intoxication. (*See* R. 11, PID 6.) But Porter's own description of the

facts in his direct appeal regarding his level of intoxication further support that the interview did not to amount to a custodial interrogation. Before the interview, he told police he had three to four beers, his last at 9:30 p.m. (R. 1, PID 23.) While he submitted to a preliminary breath test at 1:00 a.m. (his blood alcohol content was .20, according to testimony at the suppression hearing), the interview did not start until after 5:00 a.m., at which point he "no longer appeared to be intoxicated and did not slur his speech." (R. 1, PID 18, 23.)

Accordingly, habeas relief is unwarranted for Porter's third claim.

### D.

Porter next asserts that he is entitled to habeas relief because the trial court denied his request for a jury instruction on involuntary manslaughter.

Under Michigan law, involuntary manslaughter is a lesser included offense of first-degree murder. *People v. Mendoza*, 664 N.W.2d 685, 693 (Mich. 2003). When a defendant is charged with murder, an instruction on involuntary manslaughter "is appropriate only when a rational view of the evidence supports a conviction for the lesser offense." *Id.* at 694.

The Michigan Court of Appeals rejected Porter's claim (on the merits) as follows:

As it relates to this case, involuntary manslaughter is "the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed[.]" . . . "The kind of negligence required for manslaughter is something more than ordinary or simple negligence, however, and is often described as 'criminal negligence' or 'gross negligence'[.]" . . .

Although defendant testified at trial that Pilot's gunshot wound was self-inflicted, he argues that he was entitled to a jury instruction on involuntary manslaughter because of the evidence of his statements to the police during an interview. In one of his statements, defendant related that upon observing Pilot with a shotgun pressed against her chest, he reached for it and their mutual struggle over the gun caused it to accidentally discharge, killing Pilot. Even considering this version of events, a rational view of the evidence does not support an involuntary manslaughter instruction. Although this version would be evidence that the killing

15

was unintentional, defendant's act of attempting to disarm his girlfriend in an effort to stop her from committing suicide would not have been an unlawful act, and there was no evidence that the act would have been negligent. To the contrary, under those facts, defendant would not have been responsible at all for Pilot's death. Consequently, no rational view of the evidence would have supported an involuntary manslaughter instruction, and the trial court did not abuse its discretion by failing to give an inapplicable charge to the jury.

*Porter*, 2014 WL 575760 at *7 (footnote omitted).

"[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991) (citation omitted). The "only question" is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (citations omitted). "[A]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Wade v. Timmerman-Cooper*, 785 F.3d 1059, 1079 (6th Cir. 2015) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

The Michigan Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. "Simply put, the Constitution does not require a lesser-included offense instruction in non-capital cases. . . . [T]he Supreme Court has never so held." *McMullan v. Booker*, 761 F.3d 662, 667 (6th Cir. 2014); *see also Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (holding that involuntary manslaughter instruction was not required under Due Process where petitioner was charged with first-degree murder under Michigan law).

Nor was the state court's decision otherwise unreasonable. Porter's defense at trial was that Pilot killed herself while he was in another room. To the extent the evidence supported the theory that she killed herself, that would not also rationally support the theory of involuntary manslaughter. And as the Michigan Court of Appeals reasonably concluded, Porter's conflicting

16

statement to police that he was struggling with Porter and trying to prevent her from committing suicide when the gun accidentally discharged also did not support an involuntary manslaughter instruction. Porter contends that the instruction was warranted because his intoxication "removes the intentional conduct of any crime." (R. 1, PID 8.) But as noted earlier, under Michigan law, it does not. *See* Mich. Compl.  Laws § 768.37(1). As a final point, the trial court properly instructed the jury on the elements of first-degree premeditated murder, and the evidence presented at trial was sufficient to support Porter's conviction on that charge.

In short, Porter has failed to establish that the jury instructions, taken as a whole, rendered his trial fundamentally unfair. *Estelle*, 502 U.S. at 72 ("It is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." (internal quotation marks and citation omitted). So habeas relief is not warranted on this claim.

### E.

Porter next asserts that he is entitled to habeas relief because the late endorsement of jailhouse informant Richard Turner as a witness for the prosecution was improper.

The Michigan Court of Appeals rejected the claim on the merits as follows:

Not less than 30 days before the trial, the prosecutor shall provide a list of all witnesses he or she intends to produce at trial, but may add or delete witnesses upon leave of the court and for good cause shown or by stipulation of the parties. MCL 767.40a(3) and (4). The purpose of MCL 767.40a is to provide notice to the accused of potential witnesses. *People v. Callon*, 256 Mich App 312, 327; 662 NW2d 501 (2003). The Legislature did not intend for MCL 767.40a to act as a bar to relevant evidence. *Id.* at 327.

The record discloses that the prosecutor first learned of Turner's identity as a potential witness shortly before trial and quickly advised the defense. Turner confirmed that he did not come forward until 10 days before trial began. As our Supreme Court has explained, MCL 767.40a "contemplates notice at the time of filing the information of known witnesses who might be called and all other known res gestae witnesses" and "imposes on the prosecution a continuing duty to

advise the defense of all res gestae witnesses as they become known." *People v. Burwick*, 450 Mich 281, 288–289; 537 NW2d 813 (1995). Thus, late discovery or identification of a witness may be sufficient to establish good cause. *See id.* at 284–285, and *People v. Canter*, 197 Mich App 550, 563; 496 NW2d 336 (1992). On appeal, defendant does not argue otherwise, but instead asserts that Turner's late endorsement unfairly prejudiced his defense.

Regardless of whether the prosecution established good cause, a defendant must show that he was unfairly prejudiced to be entitled to any relief. *Callon*, 256 Mich App at 328. Typically, unfair prejudice results when defense counsel is unable to adequately prepare for the witness's cross-examination. *Burwick*, 450 Mich at 296. Here, the record discloses that the defense had more than a week to prepare to cross-examine Turner and had the use of a private investigator authorized by the trial court. In fact, the defense attorneys and the investigator interviewed Turner before his testimony. According to Turner, the interview lasted approximately 1–1/2 hours. The trial court required the prosecution to make a third cellmate available, whom the defense also had the opportunity to interview and ultimately called as a defense witness at trial. The third cellmate contradicted Turner's claims of his conversations with defendant. Defendant asserts that he was not able to adequately prepare for Turner's testimony because he had insufficient time to review several hours of recorded conversations between Turner and his girlfriend to hear what Turner might have discussed with his girlfriend about defendant's statements and Turner's decision to come forward. However, the value of the jail recordings is speculative, at best. Moreover, the prosecution determined the identity of Turner's girlfriend and provided her name and address to the defense. The girlfriend refused to speak with anyone. This matter was raised during cross-examination, and Turner testified that he did not know why his girlfriend would not talk to the parties to verify his story. Thus, the jury was well aware of this matter. Given the record before this Court, there is no basis for concluding that the prosecution acted improperly or that defendant was unfairly prejudiced by Turner's status as a witness.

*Porter*, 2014 WL 575760 at *8.

"A decision regarding the endorsement of a witness generally constitutes a state law matter within the trial court's discretion." *Warlick v. Romanowski*, 367 F. App'x 634, 643 (6th Cir. 2010) (citations omitted). Moreover, "[i]t is well-settled that there is no general constitutional right to discovery in a criminal case. *Id.* (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). Additionally, trial court errors in the application of state procedure or evidentiary law are generally not cognizable as grounds for federal habeas relief, *Estelle*, 502

U.S. at 67–68. Thus, to the extent that Porter challenges the state trial court's application of state law, the Court will not disturb the Michigan Court of Appeals' decision.

Still, "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (citations omitted). But Porter has failed to demonstrate that Turner's late endorsement denied him a fundamentally fair trial. As the Michigan Court of Appeals reasonably concluded, Porter suffered no prejudice as a result of Turner's late endorsement. Turner only came forward as a witness relatively late in the game, about 10 days before trial. The prosecution promptly notified defense counsel. Defense counsel then was able to interview Turner and investigate his version of events before trial and otherwise cross-examine him about his motivation to testify. The Defense also questioned and produced as a witness Porter's third cellmate (Calvin Johnson) to counter Turner's testimony. (*See* R. 8-22, PID 2550.) Moreover, Porter was not deprived of exculpatory evidence nor denied the ability to prepare an adequate defense. In other words, despite Turner's appearance as a witness, Porter's trial was still fundamentally fair.

Accordingly, habeas relief is not warranted on this claim.

**F.**

Lastly, Porter asserts that he is entitled to habeas relief because the trial court erred and violated his confrontation rights by limiting defense counsel's cross-examination of Richard Turner (who was awaiting trial on marijuana and firearm charges) regarding what his sentencing guidelines range would be if he pleaded guilty to the charges against him.

Because Porter did not object on this ground at trial, the Michigan Court of Appeals reviewed the claim for plain error as follows:

On direct examination, Turner explained that he was not offered anything in exchange for his testimony, and was motivated to come forward after discussing the matter with his girlfriend. With regard to any plea offers, Turner testified that several months earlier, he had been offered, but rejected, a plea agreement whereby he would be permitted to plead guilty to the charged offense of manufacturing 200 or more plants of marijuana in exchange for dismissal of the felony-firearm charge. Tuner stated that he rejected the offer because "the lab only had reports back from 80 to 100 plants," and he was scheduled to be tried on the following day. In response to defense counsel's inquiry on cross-examination about whether Turner's lawyer had discussed "what we call sentencing guidelines," Turner responded, "No. I mean, it's been gone over several times, but it's been back and forth, so I am not really sure on that." Thereafter, defense counsel was precluded from continuing a line of questioning about "what are sentencing guidelines" and what Turner's guidelines would be if he pleaded guilty. Under the circumstances, defendant has not established that Turner's conjecture of what his sentencing guidelines might be if he pleaded guilty had any significant relevance for the purpose of challenging Turner's credibility and bias. MRE 401.

Further, the trial court did not preclude defendant from otherwise challenging Turner's credibility and bias. Counsel was allowed to question Turner about his current charges, any plea bargaining, his failure to come forward months earlier, his girlfriend's refusal to talk to anyone to verify his story, and his hope to gain favor by coming forward shortly before his scheduled trial. Counsel elicited that Turner did not initially think that statements about murder were "a big deal," that he had no real explanation for his failure to come forward earlier, and that he refused to allow the defense to talk to his former attorney. Also, defense counsel questioned Turner about how and why [he/Porter?] and defendant's third cellmate did not hear the conversations that Turner claimed occurred. Given this record, the trial court's decision to preclude irrelevant testimony did not fall outside the range of reasonable and principled outcomes, and the decision did not deprive defendant of his right of confrontation.

*Porter*, 2014 WL 575760 at *9–10.

To start, Respondent urges that Porter's failure to make a contemporaneous objection at trial amounts to a procedural default, barring habeas review. (R. 7, PID 137.) For the sake of efficiency, the Court opts to consider the claim on the merits. *See Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (en banc) ("[J]udicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the

procedural bar issues are complicated." (internal citations omitted)); *see also Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003).

In terms of reviewing the merits of the claim, Sixth Circuit case law is inconsistent on whether plain error review amounts to a decision "on the merits" for purposes of AEDPA deference. *See Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015) (highlighting the inconsistencies). In *Frazier v. Jenkins*, 770 F.3d 485, 497 n.5 (6th Cir. 2014), the Court noted in a footnote, "We have repeatedly held that plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference." But in an earlier case, the Court instead held that the Michigan Court of Appeals' "use of the plain-error standard of review, as opposed to the clearly erroneous or de novo standards, simply made reversal of the state trial court's judgment less likely, but did not cause the Michigan Court of Appeals to bypass the merits of [the petitioner's] claim and thereby avoid triggering AEDPA deference." *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009).

The Court will follow *Flemming* and apply AEDPA deference. First, when two Sixth Circuit decisions are in direct conflict, this Court is bound by the earlier decision, here *Flemming*. *See Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001). Second, while the *Frazier* Court cited a number of cases for the proposition that a decision on plain error is not a decision "on the merits" for purposes of AEDPA, none actually reached that holding. Third, the Michigan Court of Appeals reviewed the confrontation clause claim for plain error because Porter failed to make a contemporaneous objection at trial, thereby failing to preserve the issue for review. *See Porter*, 2014 WL 575760 at *9. And in its review "for plain error affecting [Porter's] substantial rights," the court considered Porter's claim at length and ultimately concluded that the trial court "did not deprive defendant of his right of confrontation." *Id.* at *9–

21

10. Stated differently, the court certainly appears to have reached the merits of whether Porter suffered a constitutional violation. Finally, Porter does not challenge that AEDPA deference applies.

Applying AEDPA deference, the Michigan Court of Appeals decision was not unreasonable.

The Confrontation Clause guarantees a criminal defendant the right to cross-examine witnesses. *Davis v. Alaska*, 415 U.S. 308, 315 (1973). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness's story to test the witness's perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit the witness." *Id.* at 316. "[T]his right is not absolute. Instead, the Constitution guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Jordan v. Warden, Lebanon Corr. Inst.*, 675 F.3d 586, 594 (6th Cir. 2012) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original)). Thus, trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. VanArsdall*, 475 U.S. 673, 679 (1986). When it comes to challenges based on limits to cross-examination, the Sixth Circuit has explained:

> The key issue is whether the jury had enough information to assess the defense's theory of the case despite the limits on cross-examination. . . . So long as cross-examination elicits adequate information to allow a jury to assess a witness's

credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination.

*United States v. Callahan*, 801 F.3d 606, 624 (6th Cir. 2015) (internal quotation marks and citations omitted).

The Michigan Court of Appeals reasonably found no Confrontation Clause violation. The state trial court did not completely restrict defense counsel's cross-examination of Turner and his reasons for testifying at trial. Defense counsel was able to cross-examine Turner freely on a range of issues, including Turner's pending criminal charges and plea negotiations, his motivations for testifying against Petitioner, his recall of events, his failure to come forward in a more timely manner, and his overall credibility. The jury was thus well aware that Turner had pending criminal charges against him and may have hoped to curry favor with prosecuting authorities by testifying against Porter, making his credibility an issue. The trial court simply sustained the prosecution's objection on the limited issue that Turner's sentencing guidelines range was irrelevant. This was for good reason: Turner did not have a finalized plea deal in place and seemed unsure of his sentencing guidelines range. Further inquiry into sentencing consequences was not particularly relevant and would likely have been futile.

In sum, Porter is not entitled to habeas relief on this claim.

## IV.

For the reasons stated, the Court concludes that Porter is not entitled to federal habeas relief on the claims contained in his petition. Accordingly, the Court DENIES and DISMISSES WITH PREJUDICE the petition for a writ of habeas corpus.

In order to appeal the Court's decision, Porter must obtain a certificate of appealability. To obtain a certificate of appealability, a prisoner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is

required to show "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (internal quotation marks and citation omitted). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901–02 (6th Cir. 2002) (per curiam).

Here, reasonable jurists would not debate the correctness of the Court's rulings on Porter's habeas claims, which  are devoid of merit for the reasons explained. Thus, the Court DENIES a certificate of appealability.

The Court also DENIES leave to proceed *in forma pauperis* on appeal as an appeal cannot be taken in good faith. *See* FED. R. APP. P. 24(a); 28 U.S.C. § 1915(a)(3).

Finally, having been informed that Porter is now confined at the Saginaw Correctional Facility, where Thomas Winn is the warden, the correct Respondent is now Thomas Winn, who has custody of Porter. *See* 28 U.S.C. § 2243; 28 U.S.C. foll. § 2254, Rule 2(a); Fed. R. Civ. P. 81(a)(2). Accordingly, the Court amends the caption for the case to read "DONALD PORTER v. THOMAS WINN."

IT IS SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: July 25, 2017            U.S. DISTRICT JUDGE

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 25, 2017.

<u>s/Keisha Jackson</u>
Case Manager